**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **KEBAB GYROS, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:09-0061** |
| | ) | **Judge Trauger** |
| **SAMUEL RIYAD, *et al.*,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

Pending before the court is a Motion for Summary Judgment filed by the plaintiff, Kebab

Gyros, Inc., (Docket No. 41) and a Motion for Summary Judgment filed by defendant Samuel

Riyad (Docket No. 47). For the reasons discussed herein, the cross-motions for summary

judgment will be denied.

## FACTUAL AND PROCEDURAL BACKGROUND

This is a trademark, unfair competition and contract dispute between direct competitors in

the quick-service, Mediterranean cuisine restaurant business in the Nashville, Tennessee area.[1]

Prominently featured on the menus of all of the relevant restaurants in this case is the gyro

sandwich, and to fully understand the defendant's argument in this case, it is necessary to provide

---

[1] Unless otherwise noted, the facts are drawn from the parties' statements of material facts (Docket Nos. 43, 52, 53, 55, and 56) and related affidavits and exhibits. Although facts are drawn from submissions made by both parties, on a motion for summary judgment, all inferences are drawn in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

1

some brief background on the undisputed facts regarding this food.

A Turkish dish known as the "doner kebab," (or "rotating roast" or "rotating kebab") has been known in Europe since the 18th century. Although various iterations of the term "kebab," are well-known in the United States because of the "shish kabob," the term "doner kebab" is much less familiar. The doner kebab is traditionally made of lamb meat, which has been cooked on a vertical spit (or cooker) and is traditionally served with pita bread. The gyro sandwich, which frequently includes lamb meat, among other meats, also uses meat cooked on a vertical spit, and the sandwich is comprised of this meat and certain toppings and sauces stuffed into pita bread to make the sandwich. From a culinary history perspective, the parties do not dispute that the gyro sandwich, more or less, evolved from the doner kebab.

The defendant[2], largely relying on Internet blogs, website commentary, online encyclopedias and other similar material, contends that, because (particularly in English-speaking countries) the word "doner" is little known, the more familiar word "kebab" is sometimes used by sellers of Mediterranean food as something of a rough synonym for "gyro." Also, relying on the same sources, the defendant claims that sellers of the gyro sandwich (and suppliers of the equipment used to make the sandwich) will usefully and frequently combine the words "kebab" and "gyro" in the names of their restaurants and equipment, in order to more fully identify the products sold. The defendant also claims that, similarly, consumers of the sandwich will interchangeably refer to the sandwich as a "gyro" or as some iteration of "kabob," including "kebab" or "kebab/gyro." The plaintiff disputes that "kebab" and "gyro" are synonymous and

_____

[2] In this opinion, "the defendant" refers to Samuel Riyad. While two unincorporated restaurant locations, apparently formerly owned by Riyad, remain listed as defendants in this matter, the arguments in this round of briefing are squarely focused on the conduct of Riyad.

2

also disputes that these are common practices among restaurants, suppliers or consumers. With this background in place, the court turns to the specific facts of this matter.

In 1985, Salem and Claudia Ghanem, the plaintiff's predecessors-in-interest and the individuals who established Kebab Gyros, Inc., began operating a restaurant under the name KEBAB GYROS, which was located at the Hickory Hollow Mall in Antioch, Tennessee.[3] (Docket No. 40 at 1.) Over the next fifteen years or so, the Ghanems opened at least five restaurants under the KEBAB GYROS name. However, the Ghanems did not maintain an exclusive operational presence in most of these restaurants.

Indeed, during this same time period, the Ghanems sold the assets and at least some of the operational interest connected with these restaurants to individuals with whom they had become familiar, usually through a previous employment relationship at one of the KEBAB GYROS locations. (See Docket No. 40 Exs. A, C-E.) While there are currently a total of seven restaurants in the Nashville area operating under the KEBAB GYROS name, since 2002, the only KEBAB GYROS restaurant that the Ghanems continue to exclusively own and operate is located at "Metrocenter" in Nashville.

That said, the Ghanems, through the plaintiff, continue to claim an interest in the name KEBAB GYROS and in the various restaurants operating under the name KEBAB GYROS. In his declaration, Mr. Ghanem contends that the buyers of the KEBAB GYROS restaurants had become close with the Ghanems and, prior to sale, generally well acquainted with all of "the processes and methods used to operate a KEBAB GYROS restaurant," including the specific

---

[3]On December 14, 2006, the Ghanems formed Kebab Gyros, Inc., and, at that time, assigned all of their rights to the KEBAB GYROS trade name to the plaintiff.

3

recipes, the decor, and the specific suppliers from which to order. (Docket No. 40 at 1-5.) Further, Mr. Ghanem contends that, following the sales, it was generally understood that the Ghanems would remain in close contact with the buyers to ensure "the uniformity and quality of services." (*See id.* at 5.)

Two individuals who purchased KEBAB GYROS locations, however, dispute that the Ghanems provided any substantial oversight. Medhat Khalil, who purchased a KEBOB GYROS restaurant on White Bridge Road in Nashville, contends in his declaration that he purchased the restaurant from the Ghanems with no restrictions "as to the food that is served there; how it is prepared; how the restaurant is advertised; the decor of the restaurant; or the manner of service or operation." (Docket No. 44 at 1.) Mr. Khalil also contends that there is "no affiliation" between his restaurant and Mr. Ghanem's and, while he may listen to Mr. Ghanem's advice from time to time, "I do not advertise or operate my restaurant in any way to give th[e] impression" of any affiliation. (*Id.* at 2.) Milad Riyad (no relation to the defendant), who purchased a KEBAB GYROS location on Nolensville Pike in Nashville from the Ghanems in 2004, makes nearly identical representations regarding the Ghanems' relative lack of oversight and the general lack of visible affiliation between his restaurant and the Ghanems' restaurant. (Docket No. 48 at 2.) Like Khalil, Riyad does concede that he continues to receive advice regarding "food preparation or business operation" from the Ghanems, but he claims that this advice does not translate into any significant operational control. (*Id.* at 3.)

On September 25, 2002, the defendant purchased a KEBAB GYROS restaurant from the Ghanems, which is located at 5010 Thoroughbred Lane in Brentwood, Tennessee. (Docket No. 40 Ex. D.) Consistent with the discussion above, Mr. Ghanem contends in his declaration that he

4

and his wife "provided extensive training" to the defendant in the KEBAB GYROS way of doing business before selling the location to him. (Docket No. 40 at 3.)

In contrast, the defendant contends that he has more than 25 years of experience in the restaurant industry and still owns a restaurant called Sam's Kebab Gyros in Egypt, and, therefore, he did not need training from the Ghanems in how to prepare the relevant food dishes or how to run a restaurant. (Docket No. 49 at 1-2.) Additionally, similar to the declarations of Mr. Khalil and Mr. Riyad discussed above, the defendant contends that the sale of his location came with no written or oral conditions as to how food was to be prepared or how the restaurant was to be maintained and managed. (*Id.*)

In addition to setting forth the price, payment schedule and other terms, the sales contract between the Ghanems and the defendant stated that "[the defendant] understands and agrees that he is buying the use of the name Kebab Gyros for the [5010 Thoroughbred Lane] location only, and the name Kebab Gyros cannot be used by the buyer for any other location without the written consent of the seller, who retains all right, title and interest in the name Kebab Gyros." (Docket No. 13 Ex. D. at 2.)

Indeed, at this time and subsequently, the plaintiff and the Ghanems had been taking steps to protect the KEBAB GYROS name. For instance, on July 23, 2002, the Ghanems obtained state registration of the KEBAB GYROS mark from the Tennessee Secretary of State.[4] Additionally, on January 8, 2007, the plaintiff applied for federal registration of the KEBAB GYROS mark with the United States Patent and Trademark Office (USPTO).

---

[4]The plaintiff also obtained a renewed state registration of the KEBAB GYROS mark from the Tennessee Secretary of State on August 9, 2007.

5

The plaintiff's initial USPTO application for the mark was rejected on the grounds that the proposed mark was "merely descriptive" of the service at issue as opposed to being "distinctive." (Docket No. 33 Ex. D. at 1.)  However, the USPTO's "Office Action" letter to the plaintiff's counsel, which advised of the rejection, also advised that the plaintiff could submit additional proof of the validity of the mark, including a sworn statement from counsel that "the mark had become distinctive" through the plaintiff's "substantially exclusive and continuous use" over the previous five years.  (*Id.* at 3.)  In addition to challenging the USPTO's decision, the plaintiff's counsel submitted this verified statement, and, on October 30, 2007, the mark was registered by the USPTO.  (Docket No. 33 Ex. E at  4.)

At the same time that the Ghanems and the plaintiff were taking steps to protect the KEBOB GYROS mark, the defendant was opening a series of restaurants in or near Nashville similar in service and style to the Brentwood KEBEB GYROS that he had purchased from the Ghanems in 2002.  Specifically, over the course of several years, the defendant opened a restaurant called "KABAB GYRO" in Smyrna and four restaurants called "SAM'S KABAB GYRO" located in Gallatin, Antioch, on Bell Road in Nashville, and on Highway 70 in Nashville. The defendant also maintains a website called samskababgyros.com, at which one can learn about his Nashville-area restaurants.[5]

The plaintiff (or the Ghanems) have repeatedly objected to the defendant's opening of restaurants under the name KABAB GYRO or SAM'S KABAB GYRO.  For instance, in October

---

[5] As noted above, in addition to Riyad, the plaintiff maintains a lawsuit against the Gallatin and Highway 70 locations.  (Docket No. 42 at 2.)  In his declaration, the defendant contends that he has closed the Gallatin location and sold the Highway 70 location.  (Docket No. 49 at 5.)

6

2005, the Ghanems' counsel sent the defendant a cease-and-desist letter as to the operation of the Smyrna location, and, in January 2007, the Ghanems sent another cease-and-desist letter, through their counsel, again demanding that the defendant either stop using their mark or work with the Ghanems on developing a valid licensing agreement for use of the KEBAB GYROS mark. (Docket No. 13 Exs. E-F.) The plaintiff's efforts to informally resolve this dispute were apparently unsuccessful, and, on January 16, 2009, the plaintiff filed its Complaint in this court.

## ANALYSIS

The plaintiff claims that the manner in which the defendant has named his restaurants violates federal, state, and common law. Indeed, the plaintiff asserts federal claims for trademark infringement, 15 U.S.C. § 1114(1), unfair competition, 15 U.S.C. § 1125(a)(1), along with state law claims for trademark infringement, T.C.A. § 47-25-512, trademark dilution, T.C.A. § 47-25-513, and violations of the Tennessee Consumer Protection Act (TCPA), T.C.A. § 47-18-104, and common law claims for breach of contract and unfair competition. Both sides have moved for summary judgment.

## I.    Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). To prevail, the moving party must meet the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

7

In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). "The court's function is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

If the non-moving party fails to make a sufficient showing on an essential element of the case with respect to which she has the burden, however, the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir. 1999). To preclude summary judgment, the non-moving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252). If the evidence offered by the non-moving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the non-moving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249-52. "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 431 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at 247-49).

8

## II.    The Plaintiff's Claims

The plaintiff has moved for summary judgment on all of its claims, with the exception of the state-law trademark dilution claim, which the plaintiff has stated it will forego if the court grants summary judgment on the other claims.  (Docket No. 42 at 16.)  As to the remaining claims, the parties have zeroed in on two key issues, that is, (1) whether the plaintiff had a valid trademark or trade name in "KEBAB GYROS" and (2) whether the defendant's use of similar names for his restaurants is likely to cause confusion amongst the relevant consumers.

Indeed, as to federal trademark infringement, the relevant provision of the Lanham Act states that trademark infringement occurs when "any person . . . without the consent of the registrant, use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive."  15 U.S.C. § 1114.  The Sixth Circuit has developed an eight-factor test to evaluate, based on the circumstances of each case, whether confusion is likely.  *Frisch's Rest., Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 648 (6th Cir. 1982).

While federal unfair competition law arguably prohibits a broader range of deceptive behavior in commerce than trademark infringement law, "likelihood of confusion is the essence of an unfair competition claim," and, often, as one claim goes, so does the other.  *Wynn Oil Co. v. Am. Way Serv. Corp.*, 943 F.2d 595, 604 (6th Cir. 1991).  Additionally, the analysis of common law unfair competition claims and state law trademark infringement claims is also rooted in the likelihood of confusion issue and the eight-factor test.  *See id.* at 605; *see also Men of Measure Clothing, Inc. v. Men of Measure, Inc.*, 710 S.W. 2d 43, 47 (Tenn. Ct. App. 1985); *Willowbrook*

9

*Home Health Care Agency, Inc. v. Willow Brook Retirement Center*, 769 S.W. 2d 862, 867 (Tenn. Ct. App. 1988). And the same likelihood of confusion analysis that applies to state law claims of unfair competition applies when the claim is asserted as a violation of the TCPA. *See McDonald's Corp. v. Shop at Home, Inc.*, 82 F. Supp. 2d 801, 816 (M.D. Tenn. 2000); T.C.A. § 47-18-104(b)(2)-(3).[6]

Finally, as to the breach of contract claim, the elements of the claim are: (1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of the contract. *C&W Asset Acquisition, LLC v. Oggs*, 230 S.W.3d 671, 676-77 (Tenn. Ct. App. 2007). Here, the plaintiff claims that, by naming his restaurants as he did, the defendant breached the provision of the licensing agreement that prohibited him from using the KEBAB GYROS name in association with any restaurant other than the Brentwood establishment. (Docket No. 42 at 13-14.) Generally, if a defendant operates in a "manner inconsistent with its licensing agreement," and such conduct amounts to trademark infringement, the plaintiff may very well also have a viable breach of contract claim. *Westco Group, Inc. v. K.B & Associates, Inc.*, 128 F. Supp. 2d 1082, 1091 (N.D. Ohio 2001).

Therefore, as indicated by the briefing here, the key issues are whether the plaintiff had a valid trademark in the name "KEBAB GYROS" and whether the defendant's conduct was likely

---

[6] While the plaintiff does not move for summary judgment on the trademark dilution claim and the defendant's arguments in support of its motion do not focus on that claim, it is worth noting that evaluation of a trademark dilution claim under Tennessee law requires a fact-intensive exploration into whether the mark at issue is "famous" and whether the defendant "used" the famous mark and thereby "cause[d] dilution of the distinctive quality of the mark." T.C.A. § 47-25-513. As can be seen from the discussion herein, the analysis of this claim would also focus on the facts critical to the likelihood of confusion analysis, and, here, further development of the factual record would be required before the court could make an informed judgment as to that claim.

10

to cause confusion. The defendant seeks summary judgment largely based on the former issue, arguing that the plaintiff never had a protectible trademark. The plaintiff's briefing, while it counters the defendant's arguments, largely explores the eight-factor test discussed above and asserts that, under that test, it has established that the defendant's conduct caused a likelihood of confusion as a matter of law.

## A.    Protectible Mark

The defendant argues that he is entitled to summary judgment because the plaintiff does not have a valid or protectible trademark in KEBAB GYROS. (Docket No. 51 at 2.) Asserting the appropriate law (discussed in further detail below), the defendant asserts three main grounds for this view: (1) the phrase "KEBAB GYROS" is "generic" and, therefore, not entitled to protection; (2) alternatively, the phrase "KEBAB GYROS" is "descriptive" and, therefore, not entitled to protection unless it has acquired "secondary meaning," which it has not, or (3) the plaintiff abandoned any protectible interest in the phrase "KEBAB GYROS" through "naked licensing." (*Id.*) While challenging each of these arguments on the merits, the plaintiff also argues that the defendant should not be allowed, under the doctrine of "licensee estoppel," to challenge the validity of the plaintiff's trademark. (Docket No. 54 at 3-17.)

### i.    Licensee estoppel

The doctrine or theory of licensee estoppel provides that a licensee should be, in many cases, "estopped from claiming any rights against the licensor which are inconsistent with the terms of the license." *Westco*, 128 F. Supp. 2d at 1086 (internal quotation omitted). For instance, after obtaining the benefit of a trademark license but breaching the terms thereof, a licensee should not be able to "benefit from its own malfeasance" by "challeng[ing] a licensor's ownership

11

of a trademark." *Id* at 1086-89; *see also Big Boy Restaurants v. Cadillac Coffee Co.*, 238 F. Supp.2d 866, 873-74 (E.D. Mich. 2002).

A review of the relevant case law, however, indicates that, while licensee estoppel is still a recognized doctrine in the Sixth Circuit, it is not a hard-and-fast rule that bars all potential challenges that a licensee might offer against a licensor's trademark. *See Pride Publishing Group v. Edwards*, 2008 WL 2201516, *4 (E.D. Tenn. May 23, 2008)("licensee estoppel is an equitable doctrine, and a court remains free to consider the particular circumstances of the case, including the nature of the licensee's claim and the terms of the license.")

The plaintiff essentially argues that this is an appropriate case for the application of the doctrine of licensee estoppel because the defendant, in signing the license agreement with the Ghanems, implicitly recognized the unique nature of the KEBAB GYROS name, and, now, to avoid a trademark infringement claim, he attempts to argue that there was no protectible interest in the KEBAB GYROS name.  (Docket No. 42 at 21-22.)  The defendant counters by arguing that the plaintiff should not be allowed to avoid the legitimate challenges to the protectibility of the mark at issue by hiding behind an equitable doctrine.  (Docket No. 51 at 20-21.)  That is, the defendant argues, the plaintiff received registration of a questionable and, ultimately, unprotectible mark that it has done little through the years to protect and it would be inequitable to allow the plaintiff to proceed to the likelihood of confusion issue without a thorough examination of the protectibility of the mark.  (*Id.*)[7]

_____

[7] In rebuttal briefing, the plaintiff, unsuccessfully, attempts to offer more certainty regarding the applicability of the licensee estoppel doctrine to this case.  Indeed, the plaintiff contends that, under a thirty-five-year-old Fifth Circuit case, a licensee is only allowed to challenge the validity of a license after that license has expired and only on bases that have arisen since the expiration of the license.  (Docket No. 54 at 4)(citing *PGA v. Bankers Life &*

12

Here, the doctrine of licensee estoppel should not operate as an absolute bar to the assertion of the specific defenses in this case. Indeed, as discussed below, the defendant's main argument is that the mark at issue is not protectible because it is generic, or, failing that, because it is at most "merely descriptive" without a secondary meaning. As discussed herein, this is a credible argument, at least as to the latter point. The credibility and strength of this argument is only enhanced by the fact that the USPTO examiner initially rejected the trademark application because the mark was "merely descriptive," before reversing this position on the verified statement of counsel vouching for the mark's "acquired distinctiveness." Additionally, nowhere in the licensing agreement does the defendant explicitly recognize that the plaintiff has a valid trademark in the KEBAB GYROS name, so, in asserting these defenses, the defendant is not taking an obviously contradictory position to the position taken in the license agreement. (Docket No. 40 Ex. D.) Taking all of these factors into account, it is not in the interest of equity for the doctrine of "licensee estoppel" to bar a legitimate examination into whether the plaintiff ever had a protectible mark.

Also, as indicated above, the defendant argues that, through "naked licensing" of the mark to third parties, the defendant has abandoned any protection offered by the mark. A licensor

_____

*Casualty Co.*, 514 F.2d 665, 671 (5th Cir. 1975)("a licensee is estopped to contest the validity of the licensor's title during the course of the licensing arrangement . . . after expiration of the license, a former trademark licensee may challenge the licensor's title on facts which arose after the contract has expired.") The plaintiff goes on to argue that, because the factual basis for the vast majority of the defendant's challenges to the validity of the mark were in place at the time the license was entered into or prior to its termination, the licensee estoppel doctrine should be put into full force here. (Docket No. 54 at 4-6.) It is clear, however, from more recent case law in this Circuit, that the licensee estoppel doctrine is currently applied as a non-rigid, equitable doctrine that is only employed based on a full consideration of the totality of the circumstances.

issues a naked license when, following the issuance, he fails to take reasonable steps to control the quality of the use. *Westco*, 128 F. Supp. 2d at 1088. Under the Lanham Act, the issuance of a naked license may constitute abandonment of the trademark. 15 U.S.C. § 1127.

In *Westco*, in a thorough and considered analysis of the issue, the Northern District of Ohio district court directly addressed this issue and concluded that, while licensee estoppel usually precludes a licensee from arguing that he received a naked license, "licensee estoppel does not stop Defendant's [] claim that Plaintiff [] abandoned the trademark and trade name through naked licensing to a third party. The case for applying the licensee estoppel doctrine is weak when the licensee asserts a lack of control by the licensor over other users." *Westco*, 128 F. Supp. 2d at 1090 (internal quotation omitted). That is, the equitable considerations that usually preclude a defendant from challenging the conditions of its own licensing are not present when the defendant challenges the manner in which the licensor licensed the mark to third parties. *Id.* ("When a licensor fails to control the quality of goods or services sold by other licensees, a licensee loses the value of its license. In such a situation, the licensor has abandoned the trademark or trade name, rendering it useless as an indicator of origin. Yet the licensee remains subject to the terms of the license, and perhaps even continues to compensate the licensor for its rights to the trademark or trade name. This result is avoided by allowing a licensee to raise a naked licensing claim based on the licensor's relations with third-party licensees.")

In light of all of this, the court finds that the licensee estoppel doctrine should not bar the defendant from offering evidence as to the protectibility of the mark at issue. The court now turns to that evidence.

     **ii       Genericness**

14

Only those marks that are "distinctive" as a matter of law are accorded trademark protection. *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 502 F.3d 504, 512 (6th Cir. 2007). A mark that is found to be "generic" will never qualify for trademark protection. *Id.* A common example of a "generic" mark in the restaurant context would be the name of a food, such as a hot dog stand that called itself "Hot Dogs." *See Kern's Kitchen, Inc. v. Bon Appetit*, 1988 WL 69137, *1 (6th Cir. July 7, 1988). Indeed, a "generic term is one that is commonly used as the name of a kind of goods. Unlike a trademark, which identifies the source of a product, a generic term merely identifies the genus of which a particular product is a species." *Leelanau*, 502 F.3d at 513.

The question of whether a term is generic is primarily a question of fact, and when the plaintiff has federal registration of a mark, as KEBAB GYROS does here, there is a strong presumption that the term is not generic. *Id.*; *see also* 15 U.S.C. § 1115(a). The fact of registration places the burden on the defendant to overcome the presumption of validity. *Id.* Additionally, it has long been held that, in order to show a trademark or trade name is generic, the defendant must show that the "primary significance of the term in the minds of the consuming public" is the product, not its producer. *Kellogg Co. v. National Biscuit, Co.*, 305 U.S. 111, 118 (1938).

Here, the defendant attempts to meet its considerable burden to show, as a matter of law, that the use here is generic by arguing that the plaintiff has essentially placed two generic words, "gyros" and "kebab," together and added nothing original by doing so. (Docket No. 51 at 4.) That is, because, as discussed in the factual section, the words "kebab" and "gyro" in this context mean essentially the same thing and only clarify each other, it is as if the plaintiff named a hot

15

dog stand "Hot Dog & Frankfurters." (*Id.* at 5.)

In support of his argument, the defendant has attached roughly 200 pages of personal internet research, meant to show that kebabs and gyros are widely considered to be the same thing. (Docket No. 50 Ex. 1 and Docket No. 58 Ex. 1.) This evidence largely consists of Wikipedia articles, websites of several restaurants throughout the country that also have the words "Kebab" and "Gyro" in their name, and other assorted websites and blog commentary indicating that people do, at least at times, either use the words "kebab" and "gyro" interchangeably or in close association with each other. (*Id.*)

To the court, this evidence falls well short of establishing, as a matter of law, that the "primary significance of the term" KEBAB GYROS "in the minds of the [relevant] consuming public" is the foodstuffs, and not the producer. As the plaintiff points out, there is "no such thing as a 'kebab gyros.'" (Docket No. 54 at 11.) That is, there is clearly more originality to this name than if the restaurant had been named "Kebabs" or "Gyros" or even "Kebabs & Gyros." The defendant's Internet research only reveals that some people closely associate the two terms, but there is no evidence in the record, either derived from common sense or taken from the relevant consuming public in the Nashville area, that the term "KEBAB GYROS" is one that "merely identifies the genus of which a particular product is a species." Therefore, the defendant is not entitled to summary judgment based on the argument that the mark here is generic, and, indeed, the court determines that, based on the case law discussed above, the term "KEBAB GYROS" is not generic as a matter of law.

### iii. Merely descriptive without secondary meaning

Alternatively, the defendant argues that the mark here is "merely descriptive" and lacks

any secondary meaning or acquired distinctiveness. (Docket No. 51 at 9.) Marks that are "descriptive" lie between "two poles," that is, between the realm of the generic and unprotected marks and the realm of marks that are "inherently distinctive" and protected because they are "arbitrary," "suggestive" or "fanciful." *Leelanau*, 502 F.3d at 513.

An arbitrary mark "has a significance recognized in everyday life, but the thing it normally signifies is unrelated to the product or service to which the mark is attached, such as CAMEL cigarettes or APPLE computers." *Id.* (internal quotation omitted). **A fanciful mark "is a combination of letters or symbols signifying nothing other than the product or service to which the mark has been assigned," such as IBM.** *Id.* **A suggestive mark "suggests rather than describes an ingredient or characteristic of the goods and requires the observer or listener to use imagination and perception to determine the nature of the goods," such as TIDE or OCEAN SPRAY.** *Id.*

**Meanwhile, a "merely descriptive mark is often said to identify a characteristic of the thing. It is very similar to an adjective." *Id.* Marks that are merely descriptive are not inherently distinctive and not, in and of themselves protectible, but they may enjoy the benefit of protection if they develop a "secondary meaning." *Id.* A descriptive mark achieves secondary meaning and protection when, "in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product." *Id.* (internal quotation omitted).**

**As noted above, the USPTO initially determined that the KEBAB GYROS mark was "merely descriptive," but it changed that determination following the submission of a verified statement from the plaintiff's counsel that the mark had acquired secondary**

17

meaning in the relevant market.  (*See* Docket No. 51 at 10-11.)  Again, where the USPTO has registered a "mark on the Principal Register of the USPTO [that] creates a rebuttable presumption that a trademark is valid, that is, either inherently distinctive or descriptive with secondary meaning, and therefore, protectible under federal trademark law." *Leelanau*, 502 F.3d at 513.

The court agrees with the conclusion of the USPTO that the phrase "KEBAB GYROS" falls squarely between the "two poles" into the realm of "merely descriptive." That is, the phrase "KEBAB GYROS" is not "fanciful," "arbitrary," or "suggestive," but rather, similar to an adjective, the phrase "identifies a characteristic" of the thing.  It identifies, without requiring any imagination, that, within the KEBAB GYROS location, Mediterranean foods are served.  Therefore, without evidence of secondary meaning, the KEBAB GYROS mark is not protectible.  However, because the USPTO found the mark to be protectible, the defendant again faces a substantial burden to overcome the presumption of secondary meaning.

While the defendant does put forth some compelling evidence that KEBAB GYROS has not acquired a secondary meaning in Nashville, the evidence, at this stage, is insufficient to overcome the presumption of secondary meaning and establish that there is no secondary meaning as a matter of law.  The defendant, as indicated above, submitted the affidavits of Mr. Khalil and Mr. Riyad.  (Docket Nos. 44 and 48.)  Both of these individuals purchased a KEBAB GYROS restaurant from the Ghanems and claim that, because of the limited control over the KEBAB GYROS restaurants exercised by the Ghanems, these restaurants have, in essence, each gone their own way, and, therefore, "are different in the restaurant

18

design, preparation of the food, and service." (Docket No. 44 at 2; Docket No. 48 at 2-3.) Therefore, they claim, when individuals in Nashville see a sign for "KEBAB GYROS," they are inclined to think only of the type of food that might be served therein, rather than identifying that store with a particular individual or brand. (*Id.*) However, neither individual cites any specific interactions with individuals in Nashville that might lead them to this point of view.[8]

As indicated above, Mr. Ghanem has submitted a declaration in which he discusses, in considerable detail, his experiences opening and selling the KEBAB GYROS restaurants, and, in stark contrast to the declarations of Mr. Khalil and Mr. Riyad, Mr. Ghanem claims that his restaurants use specific "processes and methods" for preparing the food, and, at many of the locations he has sold, he continues to oversee the restaurant and provide guidance to the restaurateur. (Docket No. 40 at 5.) Indeed, he claims to visit Mr. Khalil's restaurant "regularly" to "ensure that the food and services remain consistent with our standards of quality." (*Id.* at 4.) In short, the declarations simply paint starkly contrasting pictures of the levels of control and dominion that Mr. Ghanem continues to exercise over these restaurants and of the effect that Mr. Ghanem has on the food, service, and decor at these restaurants.

The evidence of the actual perception of the Nashville community, however, is not well developed in the record. Other than the unsupported, conclusory statements of Mr.

---

[8] The defendant also filed an admittedly self-serving declaration, in which he makes similar representations. (Docket No. 49 at 3.)(discussing that, as of 2002, the KEBAB GYROS restaurants had "different ownership, different signs, different menus, different decor" and different methods of preparing the foods.)

Khalil, Mr. Riyad, and the defendant, the only evidence in the record regarding the perception of the Nashville community comes from a 2002 *Tennessean* article, which discusses the opening of a new KEBAB GYROS location in Donelson, Tennessee. (Docket No. 40 Ex. 2.) In that article, KEBAB GYROS is referreed to as a "chain" of franchised restaurants started by Mr. Ghanem, with locations downtown, in MetroCenter, and in Brentwood. (*Id.*) This evidence clearly supports the plaintiff's argument that the name "KEBAB GYROS," while facially only merely descriptive, has acquired "secondary meaning" in Nashville.

Apparently, very little traditional discovery, in terms of depositions and the like, has been conducted in this case. Clearly, on the evidence presented, the court cannot conclude, one way or the other, as a matter of law, whether the KEBAB GYROS mark has acquired secondary meaning in this market.

iv.   Naked licensing

The defendant contends that, even if the plaintiff once had a protectible mark in "KEBAB GYROS," he abandoned the mark through "naked licensing." (Docket No. 51 at 17.) As discussed above, the licensor issues a naked license by failing to take reasonable steps to control the quality of the use following issuance. *Westco*, 128 F. Supp. 2d at 1088. Indeed, "in order for a trademark or trade name to provide an assurance to consumers, the owner of the trademark or trade name must control the nature and quality of the marked goods and services." *Big Boy Restaurants*, 238 F. Supp. 2d at 873. Because, without control, the message conveyed by the trademark cannot be considered genuine, the issuance of a naked license may constitute abandonment of the trademark. *Id.*

20

The issue of whether a party issued naked licenses, that is, failed to properly control his trademark in the licensing process, is obviously closely tied into the business conducted by the parties and the other relevant facts of the case. *See Westco*, 128 F. Supp. 2d at 1091. Therefore, the issuance of a naked license as to one licensee may not constitute abandonment of the trademark as to licensees in a different geographical area or as to licensees who received their licenses during a different time period. *Id.* Also, the party asserting a "naked license" defense faces a "stringent" burden and must demonstrate that, through this naked licensing, the trademark has lost its significance as an indicator of origin. *Id.* at 1090.

Here, as discussed above, clear issues of fact preclude a determination of whether, and to what degree, the plaintiff issued naked licenses. Again, in a series of declarations, some (but certainly not all) of the individuals who purchased a KEBAB GYROS location claim that Mr. Ghanem exercised little control over them in regards to food, service, and decor. (Docket Nos. 44, 48, and 49.) The defendant also correctly points out that the plaintiff has not brought forth any written document indicating that Mr. Ghanem mandated any specific conditions as to food, service, and decor as a condition of sale. (Docket No. 51 at 18.) However, Mr. Ghanem plausibly contends that the vast majority of his licensees were long-time employees, who studied under him and that the close relationships he forged with these licensees prior to sale mitigated the need for constant "check ups." (Docket No. 54 at 15-17.) Moreover, even Mr. Khalil and Mr. Riyad concede that Mr. Ghanem remains active, at least to some degree, in providing a (somewhat unclear) level of advice as to the management of their restaurants. (Docket No. 44 at 2; Docket No.

21

48 at 3.)

Again, the defendant has not shown, as a matter of law, that the plaintiff engaged in a pattern of "naked licensing" such that the licensor no longer "control[led] the nature and quality of the marked goods and services." This is simply an issue where, again, in the absence of conducting further discovery on these issues, the parties have simply submitted dueling declarations, which do little more than magnify that there are disputed issues of fact as to the naked licensing issue.

B.     Likelihood of Confusion

As discussed above, clear issues of fact preclude a determination, as a matter of law, one way or the other on the "secondary meaning" and "naked licensing" issues. However, even assuming that the plaintiff has a protectible mark, a plaintiff cannot succeed on a trademark infringement/unfair competition claim without also demonstrating that there is a likelihood of confusion between the two marks. *See Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 763 (6th Cir. 2005) That is, even assuming that the mark is protectible, the plaintiff must also show that the defendant's use of the disputed mark is likely to cause confusion "among consumers regarding the origin of the goods offered by the parties." *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997).

The Sixth Circuit applies an eight-factor test to determine the likelihood of confusion. The factors to be considered are: (1) the strength of the senior mark; (2) the similarity of the marks; (3) the relatedness of the goods and services; (4) the intent of the

22

defendant in selecting the mark; (5) the evidence of actual confusion; (6) the marketing channels used; (7) the likely degree of purchaser care; and (8) the likelihood of expansion of the product lines. *Leelanau*, 502 F.3d at 515. These factors are not to be applied in a precise mathematical formula, but, rather, they are used by the court to guide the analysis and to help answer "the ultimate question," which is, "whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way." *Id*. That said, there has been no serious contention that the final factor, likelihood of expansion of the product lines, has applicability here. (Docket No. 42 at 12.)

The likelihood of confusion issue presents a "mixed question of fact and law," that is, "[a]ny disputes about the evidence that pertains to the eight factors set forth above presents a factual issue," while the ultimate conclusion as to whether the "given set of foundational facts establishes a likelihood of confusion" is a legal question. *Therma-Scan, Inc. v. Thermoscan, Inc*, 295 F.3d 623, 630-31 (6th Cir. 2002) (internal quotation omitted). As can be seen from the following discussion, genuine disputes about the "evidence that pertains to the eight factors" precludes summary judgment for either party here.

      i.     Strength of the mark

The strength of the mark "focuses on the distinctiveness of a mark and its recognition among the public." *Therma-Scan*, 295 F.3d at 631. That is, the strength of the mark is determined by where it falls on the "distinctiveness scale" (that is, where it lies between "generic" and "inherently distinctive") and by the degree to which the relevant sector of the public actually associates the mark with a particular source. *See id.*

Here, as discussed above, the plaintiff's mark falls in the middle on the

"distinctiveness scale" but there is, again, remarkably little evidence as to the degree to which the relevant public actually associates the KEBAB GYROS mark with the plaintiff. Again, the defendant puts forth the declarations of Mr. Khalil and Mr. Riyad discussed above, and the plaintiff puts forth a seven-year-old *Tennessean* article.

The record and common sense, however, point to a relatively weak mark. There is no suggestion in the record that the KEBAB GYROS name has developed anything resembling a ubiquitous presence in the Nashville area (such as a "McDonald's" or a "Walgreens"), and there is no indication that the mark is distinctive or particularly recognizable, that is, no indication that the KEBAB GYROS name always appears in a certain format or fashion. Indeed, while Mr. Ghanem's declaration contends that there is continuing "oversight" of the KEBAB GYROS restaurants, leading to consistency of food preparation, service and decor, there is little in the record to suggest that the restaurants maintain a uniquely identifiable outward appearance. (*See* Docket No. 40 Ex. 1.) While additional development of the factual record would be necessary before the court could make any firm conclusions, on this record, the strength of the mark at issue appears relatively weak.

ii.      Similarity of the marks

It is undisputed that the plaintiff's mark is for a restaurant named "KEBAB GYROS" and that the defendant gave his restaurants similar, but slightly different, names. That is, while the defendant's website identifies all of his restaurants (including the Brentwood "KEBAB GYROS" location) as SAM'S KABAB GYROS, the Smyrna restaurant was named "KABAB GYRO" and the other restaurants were named "SAM'S

24

KABAB GYRO."  (Docket No. 42 at 3-4; Docket No. 43 Exs. B-C, E; Docket No. 49 at 4.)

In comparing the marks and evaluating the potential for confusion, the court should consider the marks as they might be perceived by the public and also consider whether slight differences in spelling, wording, and arrangement would cause a distinct commercial impression in the mind of the consumer.  *See Induct-O-Matic Corp. v. Inductotherm Corp.*, 747 F.2d 358, 361 (6th Cir. 1984).

Again, the evidence presented on the similarity of the marks is not particularly compelling.  From a common sense perspective, it seems even a mildly careful consumer could readily distinguish between a restaurant called KEBAB GYROS and a restaurant called SAM'S KABAB GYRO(S).  More than the slight difference in spelling between "kabab" and "kebab," the latter name identifies a particular owner, and the former name does not.  As discussed above, one restaurant opened by the defendant in Smyrna (and then subsequently sold) did not have the moniker "Sam's" proceeding the words "KABAB GYRO."  As to this one restaurant, there is, clearly, more similarity between the two marks, and this restaurant presents a closer case on the similarity of the marks issue, even though both relevant words are spelled differently ("kabab" versus "kebab" and "gyro" versus "gyros").

       iii.      Relatedness of the goods and services

Confusion is plainly more likely where the services offered under the marks are in direct competition.  *See Daddy's Junky Music Stores*, 109 F.3d at 282.  Here, the parties are in direct competition with each other, selling very similar food in a relatively small market.  Therefore, this factor favors a finding of likelihood of confusion.

### iv. Intent

Where there is evidence that the defendant intended to infringe on the plaintiff's mark, that evidence provides considerable support for a likelihood of confusion argument. *Wynn Oil*, 943 F.2d at 602. Because of the difficulties in obtaining direct evidence of the defendant's intent, circumstantial evidence, such as a previous affiliation with the plaintiff or knowledge of the plaintiff's mark and the benefits thereof, can help establish an intent to infringe. *See id.* at 602-03. Additionally, evidence that the defendant set out to create confusion between his (presumably inferior) product and the plaintiff's product strongly supports an inference of confusion. *See Daddy's Junky Music Stores*, 109 F.3d at 286.

The plaintiff argues that the record indicates that the defendant took several intentional steps to create the impression that there is an association between the KEBAB GYROS restaurant chain (including the one the defendant maintained in Brentwood) and the group of restaurants that the defendant maintained independently, that is, the SAM'S KABAB GYRO(S) locations and the KABAB GYRO in Smyrna. (Docket No. 42 at 11.) The plaintiff points out, accurately, that the menu at SAM'S KABAB GYRO(S) and KEBAB GYROS are virtually identical, with the descriptions of the food items being very similar, if not word-for-word identical. (Docket No. 51 Ex. A; Docket No. 54 Ex. A.) For instance, the paragraph-long menu descriptions for the "gyros sandwich" and the "Chicken Sandwich" are almost exactly the same, with identical adjectives used to describe the foods. (*Id.*) Moreover, the plaintiff points to the defendant's website, which lists the Brentwood location as one of the SAM'S KABAB GYRO(S) locations. (Docket No. 43 Ex. E.)

Therefore, the plaintiff has brought forth some legitimate evidence that the

26

defendant attempted to create the appearance of an association between his independent restaurants and the plaintiff's KEBAB GYROS locations. Of course, this evidence must be weighed against the evidence in the record that indicates an intent to differentiate the defendant's independent locations from the KEBAB GYROS locations. For instance, although the descriptions of the food items on the two menus are very similar and, at times, identical, the menus themselves look very different and, viewing the menu, one would be unlikely to confuse the restaurants, as the menus use entirely different fonts, formatting and styles. (Docket No. 51 Ex. A; Docket No. 54 Ex. A.) The defendant contends that, in light of these distinctions, the identical menu descriptions should not be afforded great weight, explaining that, in an environment in which no confusion was possible, the defendant was only trying to provide a typical description of the food. (Docket No. 51 at 15-16.)

Clearly, in this sparse record, there is evidence pointing in both directions on this factor.

v.     Evidence of actual confusion

The plaintiff does not contend that there is any evidence of actual confusion, and neither party claims to have attempted to undertake any "market research" or to have conducted any "surveys" in an effort to prove actual confusion. (Docket No. 42 at 12.) Given the difficulty and cost of obtaining surveys and particularized evidence of actual confusion, a lack of such evidence is "rarely significant." *See Daddy's Junky Music Stores*, 109 F.3d at 284. Here, however, the defendant has come forward with the declarations of two KEBAB GYROS location owners who both state that the KEBAB GYROS locations are likely not perceived by the Nashville community as being part of a chain, strongly implying

27

that there would be no confusion between the KEBAB GYROS restaurants and the defendant's locations. (Docket Nos. 44 and 48.) While these declaration statements are conclusory, the plaintiff's failure to effectively counter these declarations indicates that this factor should weigh slightly against the plaintiff, at least based on the present record.

vi.      **Marketing channels used**

This factor "requires a court to consider the similarities or differences between the predominant customers of the parties' respective goods and services" and also to consider whether the parties have a similar marketing approach. *Daddy's Junky Music Stores*, 109 F.3d at 285. Here, without providing any citation to the record, the plaintiff simply argues that "[t]he marketing channels used are identical since both Plaintiff and Defendants promote their products to the same consumers and within the same market." (Docket No. 42 at 12.) While this factor appears to favor the plaintiff because both parties are attempting to reach the same set of customers, there is little detail in the record on the marketing tools used by the parties. It is clear that the defendant maintains a website and that some marketing is done through word-of-mouth and menu flyers. Again, a lack of information on this factor prevents a determination that it clearly favors one side or the other.

vii.      **Likely degree of purchaser care**

The "general proposition [is] that the average customer is likely not to exercise a high degree of care in purchasing relatively inexpensive and fungible products." *Gray v. Meijer, Inc.*, 295 F.3d 641, 649 (6th Cir. 2002). Additionally, in the context in which a consumer is unlikely to put a lot of forethought into the purchase, the likelihood of

28

confusion is generally higher. *Id.* That said, courts have cautioned that the "ultimate significance" of this factor must, perhaps more than the others, be considered in light of the analysis of the other factors. *Daddy's Junky Music Stores*, 109 F.3d at 285. That is, if the evidence suggests that there is a sufficient basis on which the consumer can readily distinguish the two products, the fact that the traditional consumer might not be especially careful in making his decision is afforded less weight. *See Gray*, 295 F.3d at 650.

       viii.    Summary

Again, "the ultimate question [is] whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way." *Leelanau*, 502 F.3d at 515. In light of the apparent weakness of the mark, the distinctions between the relevant marks, and the lack of evidence of actual confusion, along with the various outstanding factual issues, the plaintiff is clearly not entitled to summary judgment on its claims.[9] As to whether the defendant is entitled to summary judgment based on the court's analysis of the eight-factor test, the court concludes that, while the question is closer, the ultimate answer is "no."

Indeed, the defendant has done very little to advance his arguments under the eight-factor test, for instance, largely limiting his analysis to conclusory assertions such as "all the proof in this case establishes that [] confusion is unlikely." (Docket No. 51 at 22; Docket No. 59 at 16.) Additionally, not only are these businesses directly competing in a small market, but there is some evidence of an attempt by the defendant to associate itself with the

---

    [9] Therefore, it is not necessary for the court to directly address all of the plaintiff's unique arguments that were made in an effort to defeat all of the defendant's asserted counterclaims and affirmative defenses. (*See* Docket No. 42 at 17-25.)

KEBAB GYROS mark, as indicated by the defendant's website, menu, and the fact that the defendant named a restaurant "KABAB GYRO." Also, the non-confirmatory nature of the factual record on issues such as the strength of the mark, intent and actual confusion further prevents the scales tipping in favor of the plaintiff. That is, in light of all of this, the court requires more than conclusory statements from the defendant to conclude, as a matter of law, that there is no likelihood of confusion here.[10]

**CONCLUSION**

For the reasons discussed above, issues of fact preclude summary judgment for either party on the validity of the plaintiff's mark and on the likelihood of confusion issue. Therefore, both parties' motions for summary judgment will be denied.

An appropriate order will enter.

_____
**ALETA A. TRAUGER**
**United States District Judge**

---

[10]As noted above, generally, if a defendant operates in a "manner inconsistent with its licensing agreement" in a way that amounts to trademark infringement, the plaintiff likely has a viable breach of contract claim as well. *Westco*, 128 F. Supp. 2d at 1091. Here, issues of fact preclude a decision as a matter of law as to whether the defendant engaged in trademark infringement, and, therefore, the breach of contract claim would appear viable to move forward as well. The defendant argues, however, that, under the precise words of the licensing agreement, he only agreed not to use the name "Kebab Gyros" anywhere but the Brentwood location, and there is no dispute that he did not use that precise name anywhere else. (Docket No. 51 at 21; Docket No. 59 at 4.) The logic of *Westco* applies here as well, however. Clearly, "nonperformance amounting to a breach" of a licensing agreement that restricts the degree to which a licensor can use a name may include uses of confusingly similar or infringing names, and, therefore, the issue of breach here is subject to the same factual disputes that preclude summary judgment on the other claims in this case. *Westco*, 128 F. Supp. 2d at 1091.