# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **KEBAB GYROS, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:09-0061** |
| | ) | **Judge Trauger** |
| **SAMUEL RIYAD,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

Pending before the court is the defendant Samuel Riyad's Second Motion for Summary Judgment (Docket No. 143), to which the plaintiff has responded (Docket No. 162). Also pending is the plaintiff's Motion to Strike Affidavits of Medhat Khalil and Milad Riyad (Docket No. 164), to which defendant Riyad has responded (Docket No. 165). For the reasons discussed herein, defendant Riyad's motion will be granted, the Motion to Strike will be denied, and the plaintiff's claims in this litigation will be dismissed.

## FACTUAL AND PROCEDURAL BACKGROUND

This is the second round of summary judgment briefing in this trademark, unfair competition and contract dispute between direct competitors in the quick-service, Mediterranean cuisine restaurant business in the Nashville, Tennessee area. In this case, the plaintiff, Kebab Gyros, Inc., claims that defendant Samuel Riyad has infringed on its trademark and engaged in unfair competition by giving his restaurants similar names to "Kebab Gyros," which, the plaintiff claims, is its protected trademark. (*See* Docket No. 13.) Kebab Gyros, Inc. is the corporate entity

that, in 2006, restaurateurs Salem and Claude Ghanem formed and to which they assigned all of their rights to the KEBAB GYROS trade name.  (*Id.* at 4.)

In a December 17, 2009 Memorandum that denied the parties' cross-motions for summary judgment, the court determined that, in the absence of significant discovery, the court could not resolve as a matter of law (1) whether the mark at issue (the words "KEBAB GYROS") was protectible under the "acquired distinctiveness" or "secondary meaning" doctrines, (2) if the mark lost protection due to "naked licensing," and (3) whether there was a "likelihood of confusion" between the defendant's restaurant names and "KEBAB GYROS."  (Docket No. 62 at 15-30.)  The court did conclude that, as a matter of law, "KEBAB GYROS" is not "generic" and that the doctrine of "licensee estoppel" did not bar the defendant from challenging the validity of the mark.  (*Id.* at 11-15.)  The defendant has now again moved for summary judgment, relying on a significantly fuller factual record.

### A.    Restaurant History

In the early 1980s, Salem Ghanem open a "kabab shop" on Elliston Place in Nashville, Tennessee, and, in 1985, he moved that restaurant to the Hickory Hollow Mall in Nashville and named it "Kebab Gyros."[1]  After the Hickory Hollow location closed in 1988, Mr. Ghanem (along with his wife, Claude) opened another "Kebab Gyros" restaurant in the Fountain Square Mall (or "MetroCenter") in 1988.  In 1993, the Ghanems opened a Kebab Gyros on Fourth Avenue in

---

[1]Unless otherwise noted, the facts are drawn from the parties' statements of material facts (Docket No. 163) and related affidavits and exhibits.  Although facts are drawn from submissions made by both parties, on a motion for summary judgment, all inferences are drawn in the light most favorable to the non-moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

downtown Nashville and, in 1996, they opened another Kebab Gyros located at 389 Murfreesboro Road in Nashville. In 1998, the Ghanems sold the Fourth Avenue location for $25,000, and, in 2000, they sold the Murfreesboro Road location for $50,000 and opened another Kebab Gyros on Thoroughbred Lane in Brentwood, Tennessee. In 2002, the Ghanems reduced their ownership to one "Kebab Gyros" restaurant, selling the Thoroughbred Lane location to the defendant, Samuel Riyad, for $100,000.

The court discussed the contract of sale between the Ghanems and the defendant in the Memorandum, stating:

> In addition to setting forth the price, payment schedule and other terms, the sales contract between the Ghanems and the defendant stated that "[the defendant] understands and agrees that he is buying the use of the name Kebab Gyros for the [5010 Thoroughbred Lane] location only, and the name Kebab Gyros cannot be used by the buyer for any other location without the written consent of the seller, who retains all right, title and interest in the name Kebab Gyros.
> (Docket No. 62 at 5.)

In 2002, the Ghanems also "licensed or authorized" three other restaurants in the Nashville area ("White Bridge Road," "Donelson Pike," and "Harding Mall") to use the name "Kebab Gyros" in exchange for a considerable fee. Therefore, by 2002, there were seven restaurants using the Kebab Gyros name (six in Nashville, one in Brentwood), only one of which was run by the defendant and only one of which (MetroCenter) was run by the Ghanems.[2]

In 2005, a "fellow member of Nashville's Egyptian Coptic Christian community named 'Shaerif'" asked the defendant to "take over" Shaerif's failing Mediterranean restaurant located in

---

[2]Milad Riyad (no relation to the defendant) purchased the Harding Mall location with the considerable financial assistance of the defendant; the two had met while working in food services at the Opryland Hotel. The defendant sold his interest in the Harding Mall location to Milad Riyad within a year of the purchase.

Smyrna, Tennessee, about 25 miles southeast of Nashville. (Docket No. 163 at 22.) The defendant agreed, investing funds in remodeling the restaurant and signing a new lease, although day-to-day operations of the restaurant were handled by the defendant's business partner, Nabil Girgis. The defendant named the Smyrna restaurant "Kabab Gyros," and its menu referred to both the defendant's restaurants (Smyrna and Brentwood) as "Kabab Gyros Greek Restaurant." (*Id.* at 23.) The defendant was "involved" in the Smyrna restaurant for about a year, before selling his interest in the restaurant to Girgis. (*Id.* at 25.)

In 2006, the defendant assisted Aiman Gorgey in opening a Mediterranean restaurant, this one at 7114 Highway 70 South in the Bellevue section of Nashville. Mr. Gorgey is the defendant's brother in law, and, as a "thank you" for the defendant's help (assistance with paperwork, obtaining a business license, etc.), Mr. Gorgey named the restaurant after the defendant, calling it Sam's Kabab Gyros. (Docket No. 151 at 20.)

The defendant owned and operated the Kebab Gyros in Brentwood for approximately six years, making payments to the Ghanems until 2007. The defendant and his wife ran the restaurant together, with the assistance of only one or two other employees. In June 2008, the defendant sold the restaurant to Isaac Abdelnour, who runs the Brentwood location "as a family business with his wife." (Docket No. 163 at 36.) During his deposition, Mr. Abdelnour stated that he did not receive any instruction from the defendant on making the food or running the business, testifying that the food preparation was not complicated. (Docket No. 154 at 20.)

After selling the Brentwood Kebab Gyros[3], the defendant opened four additional

_____

[3]The plaintiff claims that, despite his testimony to the contrary, the defendant still maintains some interest in the Brentwood Kebab Gyros, as indicated by the fact that his cell phone number is listed on the Brentwood Kebab Gyros Facebook page as of September 27,

restaurants. Two, opened in late 2008 and located in Gallatin, Tennessee, and on Bell Road in Nashville, were called Sam's Kabab Gyro (but were sometimes referred to as Sam's Kabab Gyros). (Docket No. 158 at 143.) Despite making significant investments in these restaurants, the defendant closed both of them within 6-8 months of opening them. Since then, the defendant opened a restaurant in Franklin, Tennessee, and on Clarksville Pike in Nashville, both of which are called "Sam's Gyro" or "Sam's Gyros." Additionally, in 2009, the defendant assisted Mina Gayed in opening a restaurant on Murfreesboro Road in Nashville, also called Sam's Kabab Gyro, although the defendant has "no interest or involvement" in that restaurant. (Docket No. 163 at 39.)

**B.     Control of the "Kebab Gyros" Brand**

As discussed in the Memorandum, the extent to which the Ghanems maintained oversight over the Kebab Gyros restaurants and the Kebab Gyros brand is vigorously disputed. In the initial round of summary judgment briefing, two of the Ghanems' licensees, Milad Riyad and Medhat Khalil, claimed, through affidavits, that Mr. Ghanem sold them a "Kebab Gyros" restaurant but provided no substantive oversight to ensure consistency of product presentation and quality – a claim that the plaintiff disputed, in a conflict that the court referred to as "dueling declarations."[4]  (Docket No. 62 at 20-22.)

_____

2010. (Docket No. 163 at 38.)

[4]In this round of briefing, the plaintiff has moved to strike these affidavits, arguing that the deposition testimony of Milad Riyad and Khalil demonstrates that they did not fully understand or review their affidavits before signing them. (Docket No. 164.) Consistent with the unpleasantly hostile tone of this litigation, plaintiff's counsel accuses defense counsel of "bad faith" and fraudulent misrepresentation in preparing and submitting the affidavits. (*Id.* at 4.) The court has reviewed the defendant's response to the motion to strike and defense counsel's

Now, Khalil and Milad Riyad have given depositions in which, again, they strongly claim that they knew how to prepare the simple foods sold at their restaurants, the Ghanems provided no substantive oversight of their operations and, therefore, there is relatively little consistency of operations across Kebab Gyros locations. (*See e.g.* Docket No. 152 at 25; Docket No. 153 at 15-20.) For instance, Khalil, who owns the White Bridge Road location, testified that he paid the Ghanems a substantial fee for the "Kebab Gyros" name, thinking it was a franchise, but, in light of the lack of oversight and support, he considered that payment "robbery," and he long ago went off on his own such that "there are no similarities between" the operations of his restaurant and the MetroCenter location. (Docket No. 152 at 25-27.)

Milad Riyad, who purchased the "Harding Mall" location in 2001, offered similar testimony. He stated that, while he had worked for the Ghanems at MetroCenter, he was on his own at Harding Mall, designing his own recipes and preparations. (Docket No. 153 at 17.) Additionally, after Harding Mall closed in 2004, Milad Riyad moved his restaurant to a nearby location on Nolensville Road, keeping the "Kebab Gyros" name. (*Id.* at 24.) Milad Riyad testified that he received no assistance from the Ghanems in moving locations and that he has run that restaurant entirely on his own since it opened. (*Id.* at 25.)

Additionally, it is undisputed that the defendant purchased his supplies for the Brentwood restaurant from "different suppliers than those the Ghanems used," because he found cheaper

---

affidavit, which describes the challenges of obtaining affidavits of affiants with limited English skills. (Docket Nos. 165-166.) The court does not believe that there was any bad faith here, particularly in light of the fact that the affidavits and deposition testimony are, for the most part, consistent with each other. Moreover, in evaluating the evidence provided by Milad Riyad and Khalil, the court relied on the more recent and more in-depth deposition testimony as opposed to affidavits submitted in the earlier round of briefing. The plaintiff's motion will be denied.

suppliers.  (Docket No. 163 at 22.)  It is also undisputed that the various licensees have often

added restaurant items not served at the Ghanems' MetroCenter location.

The Ghanems gave deposition testimony in which they reiterated their position that the

licensees learned food preparation techniques from the Ghanems and that the Ghanems have

provided substantive oversight and maintained consistency of operations and appearance of the

Kebab Gyros locations through regular visits to the restaurants and by hands on instruction to

licensees and their employees (including the defendant's wife).  (Docket No. 155 at 17-19)(Mr.

Ghanem testifying that "they were trained with me, they know the business very well, and they

know the recipe, everything.  That's why I have confidence in opening for them."); Docket No.

156 at 30-32.)

The Ghanems' testimony, however, is somewhat weakened by the fact that pictures of the

various "Kebab Gyros" storefronts submitted by the defendant show that the storefronts and

signage, other than the name of the restaurant, bear very little resemblance to each other, in terms

of how the letters of the sign are arranged and the background and color of the signs.  For

instance, the Kebab Gyros sign at MetroCenter (which is still managed by the Ghanems) has

"Kebab Gyros" written in white script letters on a red background.  (Docket No. 156 Ex. 1.)  Of

the other five signs in the record, none uses script lettering, and, for reasons that are unclear, the

Fourth Avenue location is now called "Kabab Gyros (with black lettering)," and the Donelson

Pike location is now called "Kebab, Gyros & Italian Cuisine (in green lettering)." (Docket No.

156 Exs. 1-4.)  During her deposition, Ms. Ghanem first tried to claim that all the signs were the

same, and, when shown the actual signs, she claimed that the Ghanems work with their licensees

to find the best value sign as opposed to one that is similar in appearance to the others.  (Docket

No. 156 at 9, 18.)

The sign from the "Kabab Gyros" in Smyrna was introduced during the defendant's deposition. (Docket No. 158 Ex. G.) While the photograph is grainy, the main sign reads "KABAB GYRO" in block letters, and, to any reasonable observer, it bears no resemblance in styling or basic layout to the MetroCenter sign introduced during Ms. Ghanem's deposition.

### C.      Administrative and Legal Proceedings

As discussed in the previous Memorandum, on July 23, 2002, the Ghanems obtained state registration of the KEBAB GYROS mark from the Tennessee Secretary of State. (Docket No. 62 at 5.) In October 2005, the Ghanems' daughter and legal counsel Jennifer Ghanem (whose firm still represents the plaintiff here) sent a "cease and desist" letter to the defendant at the Smyrna restaurant, alleging that the defendant's use of the name "Kabab Gyros" infringed on the trademark and violated the 2002 contract. (Docket No. 163 at 26.) The letter offered to allow the defendant to continue to use "Kabab Gyros" at the Smyrna location only for $15,000. (*Id.*) The plaintiff contends that, on January 8, 2007, its counsel, T.D. Ruth, sent another letter to the defendant at the Smyrna location, again demanding that the defendant stop infringing on the "Kebab Gyros" trademark. The defendant claims that, by this time, he no longer owned an interest in the Smyrna location and would not have received the letter.

Also, as stated in the Memorandum:

[O]n January 8, 2007, the plaintiff applied for federal registration of the KEBAB GYROS mark with the United States Patent and Trademark Office (USPTO). The plaintiff's initial USPTO application for the mark was rejected on the grounds that the proposed mark was "merely descriptive" of the service at issue as opposed to being "distinctive."

However, the USPTO's "Office Action" letter to the plaintiff's counsel, which advised of the rejection, also advised that the plaintiff could submit additional proof of the validity of the mark, including a sworn statement from counsel that "the mark had become

distinctive" through the plaintiff's "substantially exclusive and continuous use" over the
previous five years. In addition to challenging the USPTO's decision, the plaintiff's
counsel, [T.D. Ruth], submitted this verified statement, and, on October 30, 2007, the
mark was registered by the USPTO.
(Docket No. 61 at 5-6)(internal citation omitted).

## ANALYSIS

The plaintiff claims that the manner in which the defendant has named his restaurants

violates federal, state, and common law. Indeed, the plaintiff asserts federal claims for trademark

infringement, 15 U.S.C. § 1114(1) and unfair competition, 15 U.S.C. § 1125(a)(1), along with

state law claims for trademark infringement, T.C.A. § 47-25-512, trademark dilution, T.C.A. §

47-25-513, and violations of the Tennessee Consumer Protection Act (TCPA), T.C.A. § 47-18-

104, and common law claims for breach of contract and unfair competition. The defendant has

moved for summary judgment for a second time.

## I.      Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) requires the court to grant a motion for summary

judgment if "the pleadings, the discovery and disclosure materials on file, and any affidavits show

that there is no genuine issue as to any material fact and that the movant is entitled to judgment as

a matter of law." If a moving defendant shows that there is no genuine issue of material fact as to

at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide

evidence beyond the pleadings "set[ting] forth specific facts showing that there is a genuine issue

for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 322-23 (1986). "In evaluating the evidence, the court must draw all

inferences in the light most favorable to the [plaintiff]." *Moldowan*, 578 F.3d at 374.

"'[T]he judge's function is not . . . to weigh the evidence and determine the truth of the

matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient," and the plaintiff's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 249, 252. An issue of fact is "genuine" only if a reasonable jury could find for the plaintiff. *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## II.     The Defendant's Motion for Summary Judgment

Once again, the defendant challenges the validity of the mark at issue before moving to the "likelihood of confusion" analysis.

### A.     Challenges to the Mark

#### I.     Validity of the Mark

The parties, once again, expend considerable effort discussing whether or not "KEBAB GYROS" is a protectible mark. As discussed in the Memorandum, if "KEBAB GYROS" is protectible, it is protectible only because it is a "descriptive" term that, through continuous use, achieved "secondary meaning," that is, "in the minds of the public, the primary significance of . . . [the] term is to identify the source of the product rather than the product." *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 502 F.3d 504, 513 (6th Cir. 2007) (internal quotation omitted). This was the basis on which the USPTO, informed by Ruth's affidavit, granted protection to the mark. (Docket No. 62 at 18.)

Again, where the USPTO has registered a "mark on the Principal Register of the USPTO [that] creates a rebuttable presumption that a trademark is valid, that is, either inherently distinctive or descriptive with secondary meaning, and therefore, protectible under federal

trademark law." *Leelanau*, 502 F.3d at 513.   In this round of briefing, the defendant once again argues that the mark is "merely descriptive" (not protected) and that there is no support for Ruth's sworn statement to the USPTO that the mark acquired "secondary meaning" through continuous use and is, therefore, protectible.  (Docket No. 146 at 4.)

In the initial round of summary judgment briefing, the court concluded that the defendant had not overcome its burden to show that the mark was not "descriptive with secondary meaning."  (Docket No. 62 at 18.)  The court noted that the evidence on this point was limited to a factual dispute between the Ghanems and the defendant (along with Medhat Khalil and Milad Riyad), with very little evidence as to how the mark is perceived in the Nashville community. (*Id.* at 19-20.)

In the second round of summary judgment briefing, the factual dispute between the Ghanems and certain licensees remains, but the record remains essentially devoid of credible evidence of community perception.  Indeed, in an unconvincing effort to demonstrate community perception, the defendant has filed a series of Kebab Gyros restaurant reviews posted on various Internet sites, which refer to the restaurants as, generally, small, no frills, and "mom and pop" type establishments.  (Docket No. 146 at 4-6.)  Because, the defendant argues, the reviews do not indicate that the locations are part of a "chain," the Nashville community must not associate "KEBAB GYROS" with a particular source.  (*Id.*.)   These isolated, self-selected, anonymous reviews notwithstanding, it is safe to say that the record remains devoid of any focused analysis of community perception.  Therefore, once again, the defendant has not carried its burden to rebut the presumption of the validity of the mark.

**ii.**      **Naked licensing**

The defendant also continues to argue that any valid mark has been abandoned through "naked licensing." (Docket No. 146 at 12.) As discussed in the previous Memorandum, the licensor issues a naked license by failing to take reasonable steps to control the quality of the mark's use following issuance. *Westco Group, Inc. v. K.B & Associates, Inc.*, 128 F. Supp. 2d 1082, 1088 (N.D. Ohio 2001) Indeed, "in order for a trademark or trade name to provide an assurance to consumers, the owner of the trademark or trade name must control the nature and quality of the marked goods and services." *Big Boy Restaurants v. Cadillac Coffee Co.*, 238 F. Supp. 2d 866, 873 (E.D. Mich. 2002). Because, without control, the message conveyed by the trademark cannot be considered genuine, the issuance of a naked license may constitute abandonment of the trademark. *Id.*

The issue of whether a party issued naked licenses, that is, failed to properly control his trademark in the licensing process, is closely tied into the business conducted by the parties and the other relevant facts of the case. *See Westco*, 128 F. Supp. 2d at 1091. Therefore, the issuance of a naked license as to one licensee may not constitute abandonment of the trademark as to licensees in a different geographical area or as to licensees who received their licenses during a different time period. *Id.* Also, the party asserting a "naked license" defense faces a "stringent" burden and must demonstrate that, through this naked licensing, the trademark has lost its significance as an "indicator of origin." *Id.* at 1090.

In the previous Memorandum, the court concluded that it could not determine the naked licensing issue as a matter of law due to the limited nature of the record. (Docket No. 62 at 20-22.) As the record has developed, the defendant's case that the Ghanems issued naked licenses has certainly gotten stronger. As discussed above, in addition to the testimony of Medhat Khalil

and Milad Riyad, the evidence has revealed that the restaurant signage is different in key ways from store to store, and the defendant has also produced considerable evidence that certain Kebab Gyros stores have been sold or passed along by the original licensee, with no apparent control by the Ghanems. (*See e,g.* Docket No. 145.)

All that said, the plaintiff is correct that the defendant has not met his "stringent" burden to show that the validly issued trademark should be canceled, as a matter of law, due to naked licensing. (Docket No. 162 at 6.) The Ghanems continue to offer sworn testimony that they do enforce the license and monitor the restaurants. Moreover, the plaintiff claims that it provided the defendant with a witness list of many licensees, and the defendant only deposed two, leaving the record on the issue of naked licensing far from certain. (Docket No. 162 at 7.) The plaintiff maintains that, if these many other licensees had been deposed, the record would reveal that "strong relationships exist and control has been exercised." (*Id.*) Naked licensing is a very factually rich issue, and, while there is certainly evidence that points in the defendant's favor, the record is simply still too sparse for the court to conclude, as a matter of law, that the plaintiff has abandoned its mark and, therefore, it should be canceled. Therefore, the court will not grant summary judgment to the defendant on the "naked license" issue.

### B.      Likelihood of Confusion

Even assuming that the plaintiff has a protectible mark, the plaintiff cannot succeed on the vast majority of its claims without showing that the defendant's use of the disputed mark is likely to cause confusion "among consumers regarding the origin of the goods offered by the parties." *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997); *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 763 (6th Cir. 2005). Indeed, as discussed in

13

the Memorandum and as all parties recognize, the plaintiff's trademark infringement, unfair competition, and TCPA claims (all potentially viable claims aside from breach of contract) are governed by the "likelihood of confusion" analysis that is used in considering a federal claim for trademark infringement.[5] (Docket No. 162 at 16-19); *Gen. Conf. Corp of Seventh-Day Adventists v. McGill*, 624 F. Supp.2d 883, 891 (W.D. Tenn. 2008); *McDonald's Corp. v. Shop at Home, Inc.*, 82 F. Supp. 2d 801, 816 (M.D. Tenn. 2000).

The Sixth Circuit applies an eight-factor test to determine the likelihood of confusion. The factors to be considered are: (1) the strength of the senior mark; (2) the similarity of the marks; (3) the relatedness of the goods and services; (4) the intent of the defendant in selecting the mark; (5) the evidence of actual confusion; (6) the marketing channels used; (7) the likely degree of purchaser care; and (8) the likelihood of expansion of the product lines. *Leelanau*, 502 F.3d at 515. As before, there is no suggestion that the final factor, likelihood of expansion of the product lines, has applicability here. (Docket No. 162 at 13.) These factors are not to be applied in a precise mathematical formula, but, rather, they are used by the court to guide the analysis and to help answer "the ultimate question," which is, "whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way." *Leelanau*, 502 F.3d at 515.

The likelihood of confusion issue presents a "mixed question of fact and law," that is,

---

[5]It does not appear that the parties have provided any briefing on the plaintiff's state law trademark dilution claim, and the plaintiff appears to have abandoned it. (Docket No 162 at 18.) To be clear, a fundamental element of this claim is that the mark at issue has become "famous," and the defendant used the mark after that time. T.C.A. § 47-25-513. While the term "famous" does not appear to be defined in the Code, under a common sense definition of the term, there is no indication from the record that "KEBAB GYROS" is a "famous" mark in this state, and, therefore, the plaintiff's state law trademark dilution claim is not viable.

"[a]ny disputes [sic] about the evidence that pertains to the eight factors set forth above presents a factual issue," while the ultimate conclusion as to whether the "given set of foundational facts establishes a likelihood of confusion" is a legal question. *Therma-Scan, Inc. v. Thermoscan, Inc*, 295 F.3d 623, 630-31 (6th Cir. 2002) (internal quotation omitted). As can be seen from the following discussion, the factual record has progressed to a point where, on the relevant, core undisputed facts, the court must conclude, as a matter of law, that there is no likelihood of confusion between the marks at issue here.

## I.      Strength of the mark

The strength of the mark "focuses on the distinctiveness of a mark and its recognition among the public." *Therma-Scan,* 295 F.3d at 631. That is, the strength of the mark is determined by where it falls on the "distinctiveness scale" (that is, where it lies between "generic" and "inherently distinctive") and by the degree to which the relevant sector of the public actually associates the mark with a particular source. *See id.* The more "unique" and "distinctive" a mark is, the stronger it is. *Id.*

In the previous Memorandum, the court stated that additional discovery was required before it could make any "firm conclusions," but "the record and common sense . . . point to a relatively weak mark." (Docket No. 62 at 24.) That is, "there is no indication that the mark is distinctive or particularly recognizable, that is, no indication that the KEBAB GYROS name always appears in a certain format or fashion . . . [or] that the restaurants maintain a uniquely identifiable outward appearance." (*Id.*)

Discovery has confirmed that the mark here, even if ultimately determined to be protectible, is very weak. Again, despite the voluminous testimony about menus, food

preparations, and restaurant licensing, the key point is that the plaintiff is seeking to protect only the words "KEBAB GYROS." (Docket No. 162 at 7-8.) This means that the strength of the mark is determined by the unique/distinctive nature of that term and the degree to which the public would associate the words "KEBAB GYROS" with a particular source. *Therma-Scan,* 295 F.3d at 631. Given that "KEBAB GYROS," in essence, describes the foods served therein and appears on unremarkable restaurant fronts in inconsistent and, at times, haphazard ways, and given that there is absolutely no consistency to the manner in which restaurant fronts display the words "KEBAB GYROS," there is no reason to believe that there is any sort of strong association between the sight of the mere words "KEBAB GYROS" and a specific, particular source. This factor, then, weighs very strongly in favor of the defendant.

### ii.    Similarity of the marks

Evaluating this factor does not involve a strict, side-by-side analysis of the two marks. *Therma-Scan,* 295 F.3d at 633. Rather, the court is to consider how a consumer would view the allegedly infringing mark alone, with the understanding that the consumer will have some, potentially vague, "impression or recollection" of the senior mark. *Daddy's Junky Music Stores*, 109 F.3d at 283. The court must view similarity by considering the "overall impression" created by the two marks, not individual features. *Id.*

In the Memorandum, the court stated that the plaintiff's case for the similarity of the marks did not appear "particularly compelling," as "even a mildly careful consumer could readily distinguish between a restaurant called KEBAB GYROS and a restaurant called SAM'S KABAB GYRO(S)." (Docket No. 62 at 25.) The court noted that the Smyrna location presented a closer case, because it was not a Sam's Kabab Gyro(s), but a "Kabab Gyros," creating more similarity

between the marks. (*Id.*)

Little has changed in the analysis. The plaintiff's argument that the "addition of SAM's . . . is not enough to create a distinct commercial impression" is conclusory and not consistent with the context of this case. (Docket No. 162 at 8.) Given that all of the relevant restaurants sell basic Middle Eastern food in unremarkable settings, the names "Kebab Gyros" and "Sam's Kabab Gyro(s)" are simply not similar, and a consumer who had seen the basic "Kebab Gyros" sign would be unlikely to be confused as to origin if he subsequently saw a basic "Sam's Kabab Gyro(s)" sign. Rather, a reasonable consumer would readily identify them as separate restaurants.

Moreover, the relevance of the similarity between "KEBAB GYROS" and "KABAB GYROS" is reduced by the fact that there is no identifiable styling or layout in which KEBAB GYROS is usually displayed. Certainly, if KEBAB GYROS were always displayed in (for example) blue lettering with a unique bold font on a white background and the defendant provided the same lettering and background for "KABAB GYROS," the similarity would be likely to cause confusion. But, as discussed above, that is not at all the case here. Moreover, the "Kabab Gyros" restaurant was in Smyrna, about 25 miles from where the bulk of the Kebab Gyros restaurants were located. In this context, the notion that a customer was likely to believe that there was an affiliation because he had seen an unremarkable sign that said "KEBAB GYROS" in Nashville and was now seeing "KABAB GYROS" on a dissimilar but also unremarkable sign in a different city 30 minutes away, simply defies logic. This factor, therefore, also strongly favors the defendant.

### iii. Relatedness of the goods and services

As discussed in the Memorandum, confusion is plainly more likely where the services

offered under the marks are in direct competition.  *See Daddy's Junky Music Stores*, 109 F.3d at

282.  Here, the parties are in competition with each other, as they sell basically the same type of

food in the Middle Tennessee region.  The defendant concedes that this factor continues to favor

the plaintiff.  (Docket No. 146 at 13.)

> ### iv.      Intent

Where there is evidence that the defendant intended to infringe on the plaintiff's mark,

that evidence provides considerable support for a likelihood of confusion argument.  *Wynn Oil*

*Co. v. Am. Way Serv. Corp.*, 943 F.2d 595, 602 (6th Cir. 1991).  Because of the difficulties in

obtaining direct evidence of the defendant's intent, circumstantial evidence, such as a previous

affiliation with the plaintiff or knowledge of the plaintiff's mark and the benefits thereof, can help

establish an intent to infringe.  *See id.* at 602-03.  Additionally, evidence that the defendant set out

to create confusion between his (presumably inferior) product and the plaintiff's product strongly

supports an inference of confusion.  *See Daddy's Junky Music Stores*, 109 F.3d at 286.

In the initial round of summary judgment briefing and here, the plaintiff argues that the

intent to copy the plaintiff's mark is apparent.  (Docket No. 162 at 9.)  That is, it is common sense

that the defendant would want to continue to suggest an affiliation with the Kebab Gyros chain

(including the Brentwood location), and the intent to copy is shown by the "menu layout and food

items offered, along with their descriptions"; as discussed in the Memorandum, the menu

descriptions of the food items offered in the plaintiff's and the defendant's restaurants are nearly

identical.  (*Id.*; Docket No. 62 at 27.)

While there is no question that the defendant copied some aspects of the Kebab Gyros

business, including menu descriptions, there is little suggestion from the advanced record that the

defendant, through opening the Smyrna restaurant or the Sam's Kabab Gyros restaurants, intended to infringe on the plaintiff's mark. The defendant testified at his deposition that he did not believe his use of a similar name would be an issue because he understood, through numerous conversations with Mr. Ghanem, that the Ghanems were leaving the "kebab restaurant" business for other types of restaurants and because the Smyrna restaurant was to be a considerable distance from the rest of the "Kebab Gyros" restaurants. (Docket No. 158 at 118-124.) Additionally, the defendant testified that, after he learned of the plaintiff's issues with the "Kabab Gyros" name, he attempted to further differentiate by calling his new restaurants "Sam's Kabab Gyro(s)" and, finally, Sam's Gyros. (*See id.*)

It also appears that the menu copying was for reasons of expediency, rather than an effort to trade on the plaintiff's mark. In the Memorandum, the court noted that the relevant menus contain often identical food descriptions, but, in other ways, often appear different from each other. (Docket No. 62 at 27.) Indeed, attached to the defendant's deposition are a slew of menus, all of which, while containing similar or identical food descriptions, look very different in terms of layout and coloring. (Docket No. 158 Ex. C-O.) As the defendant convincingly argues, "all of these restaurants are small places offering inexpensive food, where customers do not sit down and order from the menu, but go to a steam table where the items and prices are shown on a wall behind the table." (Docket No. 146 at 14.) In this context, as the defendant argues, "it would be natural for [the owners] to copy descriptions of the typical and most popular traditional Mediterranean foods being sold from previous menus available to them, rather than try to write new descriptions of their own." (*Id.* at 15.) The evidence of intent to copy the mark is simply not well established, and, therefore, this factor favors the defendant.

### v. Evidence of actual confusion

In the Memorandum, the court noted that "the plaintiff does not contend that there is any evidence of actual confusion, and neither party claims to have attempted to undertake any 'market research' or to have conducted any 'surveys' in an effort to prove actual confusion." (Docket No. 62 at 27.) The court also noted that the affidavits of Milad Riyad and Medhat Khalil, which suggested that the Kebab Gyros restaurants have all "gone their own way," weighed against any finding of actual confusion. (*Id,*)

No market surveys were taken during the discovery process, and, in their depositions, both Milad Riyad and Khalil reiterated that the Kebab Gyros restaurants have taken on different layouts and menu offerings, such that they are "very different." (Docket No. 152 at 30; Docket No. 153 at 34.) Therefore, the defendant maintains that, despite extensive discovery, no evidence of actual confusion exists, and the record reinforces the notion that there is no potential for confusion. (Docket No. 146 at 15.) In response, the plaintiff points to the defendant's deposition testimony, in which he stated that he has been asked, while working at the Brentwood Kebab Gyros, whether he owns the MetroCenter location and that he has been otherwise asked whether he is "related" to MetroCenter. (Docket No. 158 at 188-189.)

The Sixth Circuit has recognized, however, that vague, isolated instances of confusion over a lengthy period of time are not compelling evidence of actual confusion. *Daddy's Junky Music Stores*, 109 F.3d at 284. In the absence of any studies of customer confusion, the court concludes that the "needle" did not move much in either direction on this element in the course of discovery.

### vi. Marketing channels used

This factor "requires a court to consider the similarities or differences between the predominant customers of the parties' respective goods and services" and also to consider whether the parties have a similar marketing approach. *Id.* at 285. In the Memorandum, the court stated that "a lack of information on this factor prevents a determination that it clearly favors one side or the other." (Docket No. 62 at 28.) Here, the defendant argues that "the parties did not necessarily promote their products to the same set of customers, although perhaps they have used the same marketing tools." (Docket No. 146 at 15.) That is, while both parties used word-of-mouth, the internet and menu flyers, the defendant's restaurants were widely disbursed in Smyrna, Gallatin, Franklin, and Nashville, and, therefore, the customers reached might have been different. (*Id.* at 16.) In response, the plaintiff argues that all restaurants were located in "Greater Nashville." (Docket No. 162 at 12.) This factor, on balance, does probably favor the plaintiff, but it is certainly not central in the analysis.

### vii.    Likely degree of purchaser care

As discussed in the Memorandum, the "general proposition [is] that the average customer is likely not to exercise a high degree of care in purchasing relatively inexpensive and fungible products." *Gray v. Meijer, Inc.*, 295 F.3d 641, 649 (6th Cir. 2002). Additionally, where a consumer is unlikely to put a lot of forethought into the purchase, the likelihood of confusion is generally higher. *Id.* That said, courts have cautioned that the "ultimate significance" of this factor must, perhaps more than the others, be considered in light of the analysis of the other factors. *Daddy's Junky Music Stores*, 109 F.3d at 285. That is, if the evidence suggests that there is a sufficient basis on which the consumer can readily distinguish the two products, the fact that the traditional consumer might not be especially careful in making his decision is afforded less

weight.  *See Gray*, 295 F.3d at 650.

The parties both claim that, as to this factor, neither side has added anything substantive to the analysis in the course of discovery.  (Docket No. 146 at 16; Docket No. 162 at 13.)  To the court, while there is every indication that consumers probably would not put a lot of care into choosing a quick service, unremarkable meal, the products are distinguishable, in that, in most cases, the names of the restaurants are significantly different, and, in the one case in which they are not, there are, as discussed above, still significant contextual distinctions between the restaurants such that a customer would still have a ready basis to make the distinction.

### viii.    Summary

In concluding its analysis in the Memorandum, the court found that it was a close question as to whether the defendant was entitled to summary judgment based on the likelihood of confusion analysis but ruled that, in the absence of significant discovery and detailed briefing from the defendant, summary judgment was not appropriate at that early stage.  (Docket No. 62 at 29-30.)  After further discovery, the likelihood of confusion analysis, applied to the core, undisputed facts, shows that there is no likelihood of confusion here.  Again, the "KEBAB GYROS" mark, to the extent it is protectible, is a very weak mark, unadorned by any distinguishing factors and furthered weakened by the fact that it is not particularly unique or distinctive, as it simply places two foodstuffs together in a phrase.

Moreover, as discussed in detail, the challenged restaurant names are not particularly similar.  Sam's Kabab Gyros is obviously different from "Kebab Gyros," and Kabab Gyros, while closer, was briefly the name of one restaurant with a distinctly different outward appearance located about 25 miles from the plaintiff's MetroCenter location.  In the absence of any actual

evidence of intent to copy the mark (as opposed to certain business practices) or any evidence of actual confusion, the court must conclude that there is no likelihood of confusion here, and, therefore, the defendant is entitled to summary judgment on the plaintiff's trademark, unfair competition, and TCPA claims.

### C.    Breach of Contract

The elements of the claim are: (1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of the contract. *C&W Asset Acquisition, LLC v. Oggs*, 230 S.W.3d 671, 676-77 (Tenn. Ct. App. 2007). As discussed in the Memorandum, generally, if a defendant operates in a "manner inconsistent with its licensing agreement," and such conduct amounts to trademark infringement, the plaintiff may very well also have a viable breach of contract claim. *Westco.*, 128 F. Supp. 2d at 1091.

Here, the plaintiff claims that, by naming his restaurants as he did, the defendant breached the provision of the licensing agreement that prohibited him from using the KEBAB GYROS name in association with any restaurant other than the Brentwood establishment. (Docket No 162 at 18.) In the Memorandum, the court recognized that the defendant had not literally breached the terms of the contract but did not dismiss the claim due to the open question of trademark infringement. (Docket No. 62 at 30.) The court has now determined that the defendant did not infringe on the trademark as a matter of law, and, in the absence of other evidence that the defendant acted in a manner inconsistent with the contract, the court determines that the

defendant is entitled to summary judgment on this claim as well.[6]

## <u>CONCLUSION</u>

For the reasons discussed herein, the defendant's Motion for Summary Judgment will be granted, and the plaintiff's claims will be dismissed.[7]

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge

---

[6]It is, therefore, not necessary to address the defendant's argument that, even if infringement were sufficiently shown, the plaintiff would not be entitled to damages. (Docket No. 146 at 17.) In the final section of his brief, the defendant requests attorney's fees, arguing that this case was litigated for "an anti-competitive purpose," and he points to deposition testimony from Mr. Ghanem in which he suggested that he was upset because the defendant and other "Egyptian" restaurateurs had "gang[ed] together" to edge him out of the restaurant industry. (Docket No. 146 at 23.) Therefore, the defendant argues, the court should find this to be the "exceptional [trademark] case" where attorney's fees are recoverable by the prevailing party. (*Id*. at 22 citing 15 U.S.C. § 1117(a)). Alternatively, the defendant seeks attorney's fees under the TCPA, arguing that the action was "frivolous." (*Id.* at 24 citing T.C.A. § 47-18-109(e)(2)). Not surprisingly, the plaintiff responds with a lengthy discussion of the bases for the lawsuit and a series of accusations of "reprehensible" misconduct by the defendant and defense counsel, which have allegedly increased costs and delayed the resolution of the litigation. (Docket No. 162 at 19-24.) Given that there is some similarity between the marks used by the defendant and those that the plaintiff had taken steps to protect, this action was not frivolous or "exceptional" and, therefore, an award of fees is not appropriate.

[7]The closed Sam's Kabab Gyros locations in Gallatin and on Bell Road are still listed as defendants in this case on the docket. This case, through two rounds of summary judgment briefing has been a conflict between the plaintiff and Riyad. To the extent that the plaintiff maintains any claim against these shuttered restaurants, it is resolved in the defendants' favor by the court's analysis herein.

.